JENNA FARLEIGH (CA SBN 288811)
jfarleigh@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101-2683
Telephone: (206)-516-3826
Facsimile: (206) 516-3883

JULIAN SCHNEIDER (CA SBN 347246)
jschneider@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiffs*
*Gurinder Bal and CTR Capital Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND/SAN FRANCISCO DIVISION

|  |  |
|---|---|
| GURINDER BAL and CTR CAPITAL INC.; | Case No. _____ |
| *Plaintiffs*, | |
| v. | **COMPLAINT** |
| OURARING INC. and OURA HEALTH LTD.; | **1. BREACH OF CONTRACT** |
| *Defendants*. | **2. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | **3. UNJUST ENRICHMENT** |
| | **4. PROMISSORY ESTOPPEL** |
| | **5. PROMISSORY FRAUD** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Gurinder Bal and CTR Capital Inc. allege the following:

**INTRODUCTION**

1.      For more than six years, Plaintiff Gurinder Bal and his companies (together referred to as "Mr. Bal") have provided essential services to Defendants Ouraring Inc. and Oura Health Ltd., known in Finland as Oura Health Oy (together referred to as "Oura")—makers of the popular Oura smart ring capable of tracking health and wellness metrics, such as heart rate, body temperature, and sleep patterns. Mr. Bal's efforts, which were largely expended during the critical growth phase of the wearable technology device company, propelled Oura to new levels of success and its current prominence as a market leader. Mr. Bal not only was an early investor in Oura and provided initial capital to the company, but he for years served as Oura's primary marketing arm.

2.      The marketing efforts were fruitful. Since Mr. Bal first became involved with Oura in 2018, it has grown from a small start-up that had raised only $20 million by the end of 2018 to a leader in the growing wearable fitness technology market. In November 2024, Oura completed a Series D funding round led by the medical device company Dexcom that raised $200 million and resulted in a company valuation of $5.2 billion. *See* Exs. A–C.

3.      Oura has explicitly acknowledged that its own financial growth and success was in large part due to Mr. Bal's efforts. In an email dated October 27, 2020, its then CEO, Harpreet Singh Rai, emailed Mr. Bal stating: "**we wouldnt** [sic] **be here without you. You helped us get to where we are and you believed when others didnt** [sic]. Under CTR, we were able to grow revenue from 2mm a month to 6mm plus a month, or trippling [sic] in sales over the last 2 years." Ex. D (emphasis added).

4.      But, despite its success on Mr. Bal's back, Oura has now declined to honor its written commitment to him—the very commitment that led Mr. Bal to work so hard on behalf of Oura in the first place. Oura has refused to acknowledge and, indeed, has prevented Mr. Bal from exercising his contractually promised options.

5.      On information and belief, this refusal appears to be part of a pattern and practice at Oura of declining to allow past partners with contractual option rights in the company to exercise

COMPLAINT

those rights. Essentially, having already enjoyed the fruits of its deal with Mr. Bal, Oura refuses to honor its side of the contractual bargain it made.

## PARTIES

6.      Plaintiff Gurinder Bal is an individual residing in Victoria, Canada. He founded and runs CTR Capital Inc., which is also a Plaintiff in this lawsuit.

7.      Plaintiff CTR Capital Inc. is a Canadian company with its principal place of business at 3053 Edgemont Boulevard #201, North Vancouver, BC V7R 2N5, Canada.

8.      Defendant Oura Health Ltd., known as Oura Health Oy in Finland, is a Finnish company with its principal place of business at Elektroniikkatie 10, 90590 Oulu, Finland.

9.      Defendant Ouraring Inc. is a Delaware corporation with its principal place of business at 222 Kearny Street, 7th Floor, San Francisco, CA 94108.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction under 28 U.S.C. § 1332 over all causes of action alleged in this complaint because complete diversity exists and the amount in controversy exceeds $75,000.

11.     The Court has personal jurisdiction over Ouraring because it is headquartered in San Francisco, California and has general and systematic contacts with the State of California.

12.     The Court has personal jurisdiction over Oura Health because Oura Health extensively markets its products throughout the United States, including in California. Oura Health also specifically engaged in the transactions with Plaintiffs described below, including commencing a relationship with Plaintiffs in California and executing the Option Contract at issue in this lawsuit in San Francisco, California. This lawsuit arises out of those transactions.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2), (c)(2), and (d) because the Defendants are subject to personal jurisdiction in California and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## DIVISIONAL ASSIGNMENT

14.     Under Civil L.R. 3-2(c), this action may be assigned to the San Francisco Division or the Oakland Division because a substantial part of the events and omissions giving rise to the claims occurred in San Francisco.

1

**FACTUAL ALLEGATIONS**

2

A. **Mr. Bal Has Decades of Marketing Experience**

3   15. Mr. Bal was a student when he launched his first online business, offering digital

4 advertising and affiliate marketing services. Fueled by his entrepreneurial spirit, after he completed

5 his college degree, Mr. Bal started several more online businesses in the digital marketing space.

6   16. During Mr. Bal's early career, he focused primarily on for-profit marketing work.

7 But as he grew older and saw patterns in events around the world, he noticed that when people

8 work on their inner selves, those changes have ramifications for the people around them. The

9 compounding effects of striving to do better result in stronger communities, creating a more

10 resilient world. Targeting that first step in the process, Mr. Bal decided to work with companies

11 that empowered people to better themselves.

12   17. After more than a decade of building successful marketing technologies that served

13 the global market, Mr. Bal was ready to make human betterment his primary focus. Mr. Bal

14 believed that by leveraging his marketing and investment experience, he could actively (rather than

15 passively) invest in start-up technologies that aimed to help people improve themselves. His

16 approach would couple active investment with service-based contracts (typically offered at

17 significant discounts) to help launch companies with health-conscious products that might

18 otherwise have a difficult time getting off the ground. Mr. Bal's marketing services would be

19 instrumental for young companies, as the services helped fuel the companies' growth. In turn,

20 Mr. Bal's investments would have a comparative advantage due to the services he was also

21 providing. Mr. Bal's thesis was that improving people's mental, physical, and emotional well-being

22 would not only be symbiotic with designing a better world, but also with achieving superior returns

23 on investment.

24   18. Mr. Bal founded several companies to implement and promote his thesis. The first

25 company was Conscious Thought Revolution ("CTR"), which Mr. Bal founded in 2015. CTR was

26 the brand for Mr. Bal's strategy and provided the thought leadership for marrying marketing with

27 investing.

28

19.    Conscious Partners was the marketing agency, which Mr. Bal also founded and ran.[1] Conscious Partners leveraged the digital marketing space to drive traffic to game-changing ideas, entrepreneurs, and groups, including by onboarding affiliates and influencers to maximize each client's reach. By using a traffic and marketing network, Conscious Partners turned marketing into a force for good.

20.    In 2017, Mr. Bal executed the next step in his vision by creating CTR Capital—the funding arm. By way of this company, Mr. Bal has helped raise, manage, and deploy financial capital to empower companies seeking to help people better their inner selves and improve human health. The fund also seeks to redefine and measure impact investing by shifting investment dollars toward the evolution of consciousness.

21.    CTR Capital, which employs Mr. Bal's unique investment strategy, does more than provide funding. As envisioned years earlier, CTR Capital partners with the companies it invests in, offering services like marketing. This helps small start-ups grow into established companies. This approach has been a smashing success. CTR Capital now has significant assets under management, most of which are deployed.

22.    In sum, Mr. Bal's thesis has proved true.

23.    As a result, Mr. Bal has become a highly sought after advisor to super founders and companies. He now has more than a decade of experience promoting his unique investment strategy and, in 2023, he authored a book called *The New Millionaire's Playbook: 7 Keys to Unlock Freedom, Purpose, and Abundance* designed to encourage other entrepreneurs to employ his active and service-based investment strategy. The book has been a tremendous success, achieving the accolade *Wall Street Journal Bestseller*.

24.    Mr. Bal owns and controls his companies, including CTR Capital, and he has the right to sue on behalf of himself and his companies.

---

[1] On January 29, 2024, Conscious Partners changed its name to Inflektion Technologies Inc. At the time of the events at issue in this action, however, Mr. Bal's marketing company was known as Conscious Partners. So for clarity, this complaint refers to the marketing agency by its former name, Conscious Partners.

1

     **B.**    <u>**Oura Develops the Oura Ring**</u>

2        25.    Oura was founded in Oulu, Finland in 2013 by Petteri Lahtela, Kari Kivela, and

3  Markkey Koskela. On information and belief, the founders had collectively worked for over a

4  decade for different companies on product and software development. But they wanted to create a

5  wellness device that worked to inform users and help them understand their personal health data.

6  The founders decided to do this in the form of creating a compact, wearable ring that tracks and

7  uploads users' health and wellness metrics to software applications that help users follow and digest

8  the metrics with the goal of promoting health.

9        26.    Although the product has evolved over time, the current device is titanium and

10  incorporates sensors that collect a variety of information, including body temperature, heart rate

11  variability, resting heart rate, respiratory rate, sleep stages, and physical activity, among other

12  things. The ring works with the Oura App that compiles the data gathered by the Oura Ring.

13        27.    Oura has also introduced a subscription model with its rings. Users must pay a

14  monthly or annual fee to access the Oura Ring's full data. The subscription fees now account for

15  20% of Oura's revenue, which was expected to near half a billion dollars in 2024. *See* Exs. E–F.

16        28.    On information and belief, despite its current success, the early years were difficult

17  for Oura; creating a functioning and comfortable ring was challenging and funding was hard to

18  secure.

19        29.    In 2015, the founders launched the first Oura Ring on Kickstarter. The idea was

20  popular and the ring surpassed Oura's Kickstarter fundraising targets.

21     **C.**    <u>**Oura Is Led to Success by Harpreet Singh Rai**</u>

22        30.    But by early 2016, on information and belief, Oura was again struggling to stay

23  afloat. Hoping to revive the flailing company by obtaining additional capital, one of the founders

24  traveled to New York. At the time, the founder had ***never*** seen an Oura Ring outside Oura's office.

25  Ex. G at 3. While shopping at Whole Foods, the founder saw a man wearing an Oura Ring and

26  struck up a conversation. The man was Harpreet Singh Rai, a Wall Street portfolio manager, who

27  had previously purchased the ring through the initial Kickstarter campaign. As a result of that

28

conversation, Mr. Rai was invited to become an investor in Oura, which he accepted in September 2016. Mr. Rai's investment provided much needed capital to Oura.

31.    Mr. Rai eventually was asked to join Oura's Board of Directors, became President of Oura in early 2017, and went on to become Oura's CEO (of both Oura Health and Ouraring) in 2018.

32.    On information and belief, Mr. Rai's connections in North America were a key reason for his selection and success as CEO.

33.    Mr. Rai oversaw the establishment of Oura's U.S. headquarters in San Francisco, which was branded as Ouraring.[2] To scale these U.S. market operations, Mr. Rai was based out of New York and San Francisco. By the end of 2018, Oura began issuing press releases jointly from both Oulu, Finland and San Francisco, California:

> Oulu, Finland / San Francisco, California – Today Oura Health announces that it has raised $20 million to date.

34.    The Oura entities operate as one. They market under the "Oura" brand name. They maintain one website: <ouraring.com>. And that website sets forth a unified, worldwide front that touts "worldwide" sales and more than 600 employees working "across countries and continents." Ex. H at 3.

35.    Similarly, Oura's Terms of Use in 2018, which were available at <ouraring.com>, presented a unified company. Ex. I.

36.    In addition to unified marketing, Oura's leadership team serves roles in both companies. For example, Mr. Rai served as CEO of both companies. And Oura does not distinguish the leadership of each company in its representations to the public. *See* Ex. J.

37.    The company works as follows: Oura Health sells the Oura Ring and related services outside the United States while Ouraring is authorized by Oura Health to sell the Oura Ring and related services inside the United States. Oura Health wholly owns the U.S.-based Ouraring.

38.    Oura's U.S. expansion was a financial winner. Before Mr. Rai joined Oura, the company relied in part on Finnish government loans for 1.5 million euros, as well as hundreds of

---

[2] Oura's U.S. legal entity, Ouraring Inc., was incorporated in Delaware on October 21, 2014, according to Delaware's Division of Corporations.

thousands of dollars in grants. Also before Mr. Rai joined Oura, Oura's largest funding round amounted to 5 million euros, at which time the company employed just 15 people. *See* Ex. K.

39.     Mr. Rai took the helm as CEO at Oura in June 2018 once the company had raised an additional funding round of 12.5 million euros. At the time, Oura stated that Mr. Rai's leadership and the new funding would propel Oura's growth in the United States. Oura simultaneously added two board members who were "US industry specialists," Stephen Friend and Kevin Lin. Ex. L at 2.

40.     In its announcement, Mr. Rai stated that Oura's "main goal is to drive awareness and sales in our largest market, while doubling down on the very innovation that brought us here in the first place." *Id*. at 3.

41.     Oura Health CIO and co-founder Petteri Lahtela emphasized Mr. Rai's central role in the company's North America expansion: "I have great respect for Harpreet. He knows the US market and can lead us towards growth and greater market penetration. I'm excited for this next phase for Oura[.]" *Id*. at 3.

42.     As expected, the company continued to experience explosive growth under Mr. Rai's leadership, raising over $20 million in 2018. Ex. A. In 2021, Mr. Rai announced an additional $100 million in new funding. Ex. M at 3.

43.     Mr. Rai served as CEO until 2021. During his tenure, Oura grew its headcount by 20x, its revenue by 100x, and secured over $140 million in funding. Ex. N.

**D.     Oura Persuades Mr. Bal to Invest and Provide Services**

44.     Mr. Bal was an early investor and service provider to all Oura entities.

45.     In January 2018, Mr. Bal was introduced to Mr. Rai (who was at the time the President of Oura) at a start-up conference known as A360 in California. Mr. Rai attended the conference on behalf of Oura. Mr. Rai was intrigued by Mr. Bal's investment strategy and marketing experience and thought it could help Oura, which was a still-nascent company focused on the global wearable health market.

46.     That introduction led to many conversations. It was apparent to Mr. Bal that Mr. Rai was a rising star within Oura. In April 2018, Mr. Rai emailed Mr. Bal and another investor to inform

them that the "founders" had "agree[d] to making me CEO," noting that Mr. Rai would assume the position of CEO during summer 2018, after a board meeting. Ex. O at 2. Mr. Rai noted that "the whole board and the founders" were "committed" to and confident in Mr. Rai. *Id*. And, as planned, Mr. Rai became CEO of Oura in summer 2018. Ex. L.

47.    After Mr. Rai became CEO, Mr. Bal and Mr. Rai continued their conversations about Mr. Bal's potential involvement with Oura. During these conversations with Mr. Rai, Mr. Bal learned more about Oura's mission. As he learned more, Mr. Bal was increasingly interested in helping to empower the young company. Although Mr. Bal and Mr. Rai discussed the prospect of Mr. Bal providing marketing services, Oura was not in a position to pay for services until it obtained more funding.

48.    Mr. Rai asked Mr. Bal to invest in Oura. On information and belief, Mr. Rai was particularly interested in obtaining funding from Mr. Bal because of his founder-friendly approach. Rather than a more extractive model of venture capital, Mr. Bal's firm offered an institutional investor that Oura could count on and that was aligned with the company's mission.

49.    In turn, Mr. Bal believed in the fledgling company. He believed in its promise to give people greater control over their own health. He believed in Mr. Rai's leadership. And he knew that his investment could propel the company forward, as well as pave the way to more funding. Mr. Bal decided to take a risk and put his weight behind Oura. In August 2018, Mr. Bal and CTR Capital executed an agreement with Oura to invest approximately 400,000 euros. *See* Ex. P.

50.    After investing in Oura, Mr. Bal followed his investing thesis by agreeing to provide advising services to Mr. Rai and Oura. In addition, with an infusion of cash from Mr. Bal and CTR Capital, and later others, Oura was ready to begin marketing. So Mr. Bal entered into a services-based agreement to further help Oura grow and scale. *See* Ex. Q.

51.    Mr. Rai, on behalf of Oura, repeatedly indicated that Oura saw significant value in Mr. Bal's work and particularly felt that Mr. Bal could help Oura grow in the largest global market for this type of device, North America. Due to this value, Mr. Rai agreed to compensate Mr. Bal for his efforts. But Oura's financial situation was still somewhat tenuous.

52.     As a result, the compensation that the parties agreed to, which was memorialized in part in the Conscious Partners Services Agreement, *see* Ex. Q, allowed Oura to pay a heavily discounted fee to Mr. Bal and Conscious Partners for marketing and media services. Mr. Bal and Conscious Partners typically would have accepted $50,000 per month plus 15% of advertising spend in compensation for their services. Instead, they accepted $3,000 per month plus 10% of advertising spend in the first contract. Schedule C, Ex. Q. They later agreed to maintain a discounted rate for a ***second*** year. Ex. R.

53.     In exchange for this steep discount, Oura offered Mr. Bal and CTR Capital stock options in Oura. The deal was simple: Mr. Bal would help Oura reach a certain global sales target. He and Conscious Partners would be paid a highly discounted rate for these marketing services, and Mr. Bal would otherwise ***not*** be compensated for his advising services, but if Mr. Bal was successful, he would have the opportunity to purchase stock options in Oura. Essentially, Mr. Bal would risk both his capital and his time but, in the event of success, he would be disproportionately rewarded through stock options whose value would also track the company's overall success.

**E.     Oura Offers Mr. Bal Stock Options to Obtain Discounted Services**

54.     Mr. Rai, on behalf of Oura, and Mr. Bal, on behalf of himself and CTR Capital, negotiated the at-issue Option Agreement in September and October of 2018.

55.     On September 24, 2018, Mr. Rai offered CTR Capital "250k worth of advisory options priced at €12 per share." Ex. S at 4. He explained that "all options will be automatically granted upon . . . Oura achieving 3 consecutive months with sales greater than 6,500 rings per month." *Id*. Mr. Rai stated that achieving this sales target would support raising a substantial sum of money during a series B fundraising round.

56.     In response to Mr. Rai's email, Mr. Bal negotiated the quantity of options. Mr. Bal wanted an option right already valued at "500k EUR," rather than an option right already valued at 250k EUR, which was the amount offered by Mr. Rai. *Id.* at 3. As part of the negotiations, Mr. Bal offered his companies' marketing services for 10% of advertising spend—a substantial discount from the agency's typical rate of 15% to 25% of advertising spend. *Id*. at 4. Mr. Bal explained this

discounted rate as a way "to further align incentives" because they "want[ed] [their] options to be worth a lot more." *Id.*

57.    Mr. Rai accepted Mr. Bal's offer of a discounted rate on the marketing services.

58.    But, as for the options, Mr. Rai insisted that he couldn't offer more options than the amount that was currently valued at 250k at the time. Mr. Rai explained that Oura's Board had said that more than 250k in options was "too much to give away." *Id.* at 3. Mr. Rai stated that "what [he was] trying to do [was] issue an option for free upon certain (loose) hurdles." *Id.* So Mr. Rai told Mr. Bal that he had two options: Mr. Bal could either accept "250k worth of stock for free (no cash down) upon delivering hurdles" or pay "500k with [the] option to buy another 500k after hitting hurdles." *Id.* at 2, 1.

59.    Mr. Bal and CTR Capital chose the former: the no cash down option. This deal was commemorated in the 2018 US Stock Option Agreement (the "Option Agreement") issued to Mr. Bal and CTR Capital. Ex. T.

> **OURA HEALTH OY / OURA RING INC. ADVISER EQUITY PLAN 2018**
> **US STOCK OPTION AGREEMENT**
>
> Optionee:                    Gurinder Bal  / CTR Capital                    ("Optionee" or "you")

60.    Importantly, the Option Agreement, signed by then-CEO Mr. Rai, is between both Oura companies (Oura Health Oy and Ouraring Inc.) on the one hand and Mr. Bal and CTR Capital on the other.

61.    At all times, Mr. Bal believed based on Mr. Rai's representations as CEO of the company that the Board was fully aware of and in support of the Option Agreement.

62.    Mr. Rai stated or implied the Board's knowledge and approval of the Option Agreement in at least three separate emails on September 24, September 26, and October 2, 2018. Ex. S at 1–3.

63.     At all points before, during, and after the execution of this Agreement, Mr. Bal believed Mr. Rai had actual and apparent authority to enter the Option Agreement on behalf of Oura and neither Mr. Rai nor anyone at Oura gave any contrary indication.

64.     For example, in an email on October 2, 2018, Mr. Bal displayed his belief that the Board knew about the negotiations:

> What does the board need to hear/feel to trust that this will be a no-brainer? What would seal the deal? We will crush it on the ad side, but even beyond that what or who should CTR bring to the table to make it be $500k allocation + $500k worth of stock upon delivering hurdles? Ex. S at 1.

65.     The same day, Mr. Rai responded, representing that the Board was, in fact, in the loop and that the Board approved of issuing some quantity of options to Mr. Bal:

> 500k is too much equity to giveaway. They [the Board] said on [sic] issue if it's 100k or 200k . . . but 500k is too big. Boards [sic] pushback is you will get there anyway - and there are 1000 agencies. *Id.*

66.     Mr. Rai's actual and apparent authority to enter the Option Agreement was consistent with Oura's practice at that time. Oura consistently held Mr. Rai out as its representative.

67.     For example, after the negotiations between Mr. Rai and Mr. Bal, Oura announced a funding raise in December 2018. At the top of the press release, Oura quoted Mr. Rai:

> "We are thrilled to have such a talented group of builders, champions, and creators join us as investors," said Harpreet Rai, CEO of Oura Health. "It's amazing to see how such a diverse group of investors all recognize the universal importance of sleep." Ex. U at 2.

68.     Oura's announcement ended by directing press to "Harpreet Rai, Oura Heath CEO" for more information. *Id.* at 3.

69.     Mr. Bal and Mr. Rai executed the Option Agreement in San Francisco. The Agreement granted Mr. Bal and CTR Capital an "option . . . to purchase shares of Oura Health Oy . . . Common Stock under the Oura Health Adviser Equity Plan 2018 and its US Addendum." Ex. T at 1.

70.    The Option was "in conjunction with CTR Capital's investment and also with CTR becoming the advertising agency of record" and the reason for the Option was "for CTR Capital to act as advisers and also in conjunction with their ad services." *Id.*

71.    The Option Agreement was designed to compensate Mr. Bal and CTR Capital in light of the heavily discounted marketing rate and is signed by Mr. Bal and Mr. Rai, on behalf of Oura. The Agreement was the ***only*** compensation to Mr. Bal and CTR Capital for their work as advisors to Oura.

72.    The details of the Option Agreement provide as follows:[3]

| | |
|---|---|
| **Number of Shares:** | 29,166 |
| **Exercise Price:** | EUR  0.50 per share |
| **Grant Price:** | EUR  12.00 per share |
| **Date of Grant:** | Upon hitting 90 day sales of 21,000 rings |
| **Vesting Start Date:** | Upon grant date |
| **Type of Option:** | Incentive Stock Option _____<br>Non-Statutory Option      __x__ |
| **Expiration Date of Option:** | December 31, 2024 |
| **Vesting:** | 4 year post gant date. , 1 year cliff, monthly vesting after the 1 year cliff |

73.    Under the Option Agreement, Mr. Bal and CTR Capital would be granted the Option when Oura hit 21,000 rings sold in a 90-day period.

74.    The sales target was a ***global*** sales target for Oura Health Oy ***and*** Ouraring (i.e., including U.S. Sales). This made sense since Mr. Bal was primarily marketing within the United States. Ouraring, located in the United States, is the exclusive seller of the Oura Ring in the United States. In addition, the United States is Oura's largest market. *See* Ex. K at 2 (noting 70% of Oura's sales were in U.S. in 2016); Ex. L at 3 (referring to U.S. as "our largest market" in 2018).

---

[3] Perplexingly, as drafted by Oura, the number of shares listed in the agreement is internally inconsistent, but only off by 1 share. The early portion of the documents lists the number of shares at 29,167 and the detailed section lists it at 29,166.

75.    The Agreement's other provisions are straightforward: The exercise price is 0.50 euros per share; the grant price is 12 euros per share; and the vesting period was over four years, with a one-year cliff and monthly vesting.

76.    The Agreement further states that "[t]he aggregate value of the option is 29,167 x €12.00 EUR per share which translates to €349,992.00." Ex. T at 1.

77.    Notably, the Agreement represents a compromise between Mr. Bal's request for €500,000 in stock options and Mr. Rai's initial offer of €250,000 in stock options.

78.    The Agreement also addresses whether an optionee can exercise the Option after termination of a relationship with Oura. The Agreement provides that if the "Adviser Status or other service relationship with Oura Health or one of its Subsidiaries Terminates for any reason, you will be entitled to exercise your vested Options." *Id.*

79.    The Agreement notes the company's expectation that "the value of these options [will] be worth substantially more in the next 12 months." *Id.*

80.    The terms are therefore simple. Under the Agreement, Mr. Bal and CTR Capital would be granted the option to purchase 29,167 shares after Oura sold 21,000 rings in 90 days. Mr. Bal and CTR Capital had until December 31, 2024, to exercise the Option.[4]

81.    The Option Agreement is attached to this complaint, *see id.*, and the Agreement's provisions are incorporated in full as if fully set forth here.

**F.    Oura Wildly Exceeds Its Sales Target and Becomes a Spectacularly Successful Company**

82.    After the introduction of Oura's second-generation ring and the marketing blitz directed by Mr. Bal in North America, sales skyrocketed. This success was due in large part to the promotion of the ring. Mr. Bal played a critical role in that promotion, leading directly to its success with consumers.

---

[4] Mr. Bal and Mr. Rai negotiated the Option Contract over several weeks. During the negotiations, Mr. Bal and Mr. Rai signed an early version of the Option Contract that had numerous errors, including misspelling Mr. Bal's name and misstating the expiration date as December 31, 2023. This Contract was executed on October 13, 2018, and it was then amended and superseded by the operative Option Contract.

83.    Mr. Bal provided substantial advising services to Mr. Rai and Oura. Mr. Bal scheduled a weekly call with Mr. Rai to coach him through the sorts of issues that Mr. Bal knew were common for chief executives of young companies, such as vetting and hiring talent, how to get the most value from vendors, and how to strategically approach marketing.

84.    Mr. Bal also introduced Mr. Rai and Oura to key constituencies, including, for example, the community of biohackers who became some of Oura's earliest adopters.

85.    Mr. Bal brought Mr. Rai to conferences, arranged for him to speak on podcasts, and raised brand awareness for Oura during its critical growth phase. For example, in the fall of 2018, Mr. Bal brought Mr. Rai to the Transformative Technology Conference in Palo Alto, where Mr. Bal set up a discussion about Oura's ring and personally interviewed Mr. Rai in front of an audience of investors and other members of the technology community.[5]

86.    In addition to the advising services, Mr. Bal and Conscious Partners tackled a wide range of marketing tasks for Oura to propel its success. For example, Mr. Bal and his company collaborated with media buyers to develop angles, creatives, and landing pages. They managed and analyzed affiliate traffic to grow sales, improve conversion rates, and reduce improper affiliate commissions, resulting in both massive sales *and* savings. They generated statistics and analytics for various issues, like conversion rates and cart abandonment rates, to improve optimization of sales. They ran split tests and multivariate tests to ensure effectiveness of advertising spend, again driving sales *and* reducing costs. And they coordinated retargeting campaigns from paid media channels and influencer channels. In addition to external marketing and advertising work, Mr. Bal provided internal marketing reports to help Oura deploy marketing insights across its company.

87.    To put some numbers on this wide range of tasks, Mr. Bal and his team identified over $2 million *annually* in wasted marketing spend. They also increased Google and Facebook advertising conversions by over *500%,* while virtually eliminating product discounts (by 97%), dramatically slashing costs (for example, by 80% compared to Google's recommended advertising implementation), and more than halving the cost of acquiring new customers.

---

[5] The Transformative Technology Conference, *Harpreet Sing* [sic] *Rai, Oura Ring – Wearables: Sleep and Psychological Wellbeing*, YouTube (Nov. 22, 2018), https://www.youtube.com/watch?v=LcxsHlKJAH0.

88.     Under the Services Agreements, Mr. Bal and his team reported directly to Mr. Rai. *See* Ex. Q at 2; Ex. R at 2. But they communicated with numerous Oura team members to help drive its ever-increasing sales.

89.     On October 24, 2020, Mr. Bal's team emailed Mr. Rai summarizing some of the recent work performed for Oura. Notably, Mr. Bal's team emphasized that they put in approximately **300 hours** per month for Oura; that Oura ***still*** paid a reduced amount compared to any other client due to the deal struck between Mr. Bal and Mr. Rai; and that this legacy structure was expected to save Oura over **$600,000** in 2020 alone.

90.     Due to Mr. Bal's tremendous efforts, including both undercompensated ***and*** uncompensated work, Oura hit and substantially exceeded its sales target.

91.     On October 27, 2020, Mr. Rai sent an email to Mr. Bal. The subject of the email was "following up - end of contract notification and end of vesting notification." Ex. D. That email effusively praised Mr. Bal for his marketing and advising work, emphasizing his extensive contributions to Oura's success. Mr. Rai stated: "**we wouldnt** [sic] **be here without you. You helped us get to where we are and you believed when others didnt** [sic]. Under CTR, we were able to grow revenue from 2mm a month to 6mm plus a month, or trippling [sic] in sales over the last 2 years." *Id*. (emphasis added).

92.     In addition, Mr. Rai's email noted the mutually beneficial nature of the relationship between Oura and Mr. Bal: "I'm glad we have grown the way we have w/ your help and we've both done extremely well." *Id*.

93.     As a result of Oura's success, the email noted the company would "be transitioning to a much larger established [marketing] agency." *Id*. The email purported to end Conscious Partners' service "as agency as record" and "end the vesting of our advisor agreement." *Id*. But the email did not in fact terminate the service relationship. Instead, the email specifically "kep[t] [the] consulting contract going for 60 days till end of year." *Id*.

94.     Before those 60 days elapsed, on December 1, 2020, Oura entered into an Ongoing Services Agreement with Conscious Partners. *See* Ex. V. That contract remains in effect. Conscious Partners was never terminated.

95.    In addition, Oura has never purported to end Mr. Bal's role as an advisor, for which he was compensated solely by the Option Agreement. Indeed, as recently as May 2025, Mr. Bal connected Tom Hale—Oura's current CEO—with the founder of Human Tech Week to help Mr. Hale obtain a coveted slot for a keynote address or fireside talk during the June 2025 technology conference.

96.    Mr. Rai's email confirmed that out of the total shares granted, 14,583 stock options had *already* vested as of the date of the email (October 27, 2020).[6] Ex. D.

97.    But since Mr. Bal continued to provide services following that date pursuant to a contract still in effect, all shares in the original Option Agreement have now vested.

### G.    Oura Terminates Mr. Rai as CEO

98.    Mr. Rai was a tremendously successful CEO. In May 2021, Mr. Rai announced $100 million in new funding. Ex. M at 3. But, despite Mr. Rai's success as CEO of Oura, he stepped down from that position in 2021. Ex. W.

99.    At the time, Oura praised Mr. Rai's work publicly, stating:

> Harpreet [Rai] joined the company as an investor in 2016, took on an active operator role as President in 2017, and became CEO in 2018. Throughout that time, he has built a strong organization, scaling the business through COVID, and growing the company to over 350 employees. Harpreet led Oura through its most ambitious product launch to date, Oura Ring Generation 3, instituted a new membership business model, and built a top leadership team that is ready to take the company to the next level. *Id*. at 1.

100.    Eurie Kim, the Chair of Oura's Board, also spoke highly of Mr. Rai's leadership and explicitly praised him for navigating the company through the challenges of the COVID-19 pandemic:

> We are grateful to Harpreet who has brought this startup-company from Finland to the global main stage of health and wellness. . . . Harpreet navigated the company through these past two tumultuous years of the pandemic and successfully executed the launch of our Generation 3 ring along with the introduction of our new membership for our community. *Id*. at 2.

---

[6] Although the email purported to preemptively terminate the vesting of the remaining shares given the envisioned end of Mr. Bal's services agreement, it cannot serve to do so since Mr. Bal continued to provide services to Oura under the Option Agreement, the Conscious Partners Services Agreement, and later the Ongoing Conscious Partners Services Agreement.

101.    The incoming CEO, Michael Chapp, expressed his gratitude "to Harpreet for his friendship, leadership, and everything he has accomplished." *Id*. at 1.

102.    This praise was unsurprising. Mr. Rai had taken Oura from a product that its founder had ***never*** seen outside the office before he met Mr. Rai to ***the*** wearable fitness technology— celebrated and used by celebrities and the N.B.A. Ex. G at 3–4.

103.    Although the services agreements between Mr. Bal and Oura were negotiated and entered into by Mr. Rai, Oura has not retreated from them. Oura has never suggested that Mr. Rai did not have the authority to enter into those agreements. Instead, Oura has continued to accept services from Mr. Bal and has never served him with a notice of discontinuation.

104.    Since Mr. Rai's departure from the CEO role in 2021, Oura has enjoyed continued financial success. By March 2022, Oura had sold more than a million rings, Ex. X, and by June 2024, it had sold more than 2.5 million rings, Ex. Y. In October 2024, Oura signed a deal with the U.S. Department of Defense worth $96 million to supply smart rings to service members. Ex. Z at 2. And, in November 2024, Oura completed a Series D funding round led by the medical device company Dexcom that resulted in a company valuation of $5.2 billion. Ex. C.

**H.    Oura Breaches the Option Agreement**

105.    In 2024, as the date for Mr. Bal to exercise his options approached, Mr. Bal got wind of several similar lawsuits where Oura refused to let similarly situated individuals exercise past options agreements with the company. Given Mr. Bal's long history with the company, on October 29, 2024, Mr. Bal sent a check by FedEx to Oura's U.S. headquarters in the full amount needed for the 29,167 shares coupled with a legal demand to execute dated October 30, 2024. Ex. AA.

106.    In late 2024, Oura acknowledged through its General Counsel that it had received the demand. In a December 2024 email and follow-up phone call, Oura formally indicated that it was unwilling and unable to allow Mr. Bal to exercise the Option Agreement. Now that the December 31, 2024, exercise deadline has passed and Oura has refused to issue Mr. Bal and CTR Capital the stock to which they are entitled under the Option Agreement, Oura is in breach of that agreement.

1    **I.    Oura's Breach Damages Mr. Bal**

2        107.    Mr. Bal has performed years of work at a heavily discounted rate and has likewise

3    provided years of advising work for which he has been entirely uncompensated. Mr. Bal offered a

4    discounted rate—resulting in at least $600,000 in lost revenue in 2020 alone—explicitly due to the

5    Option Agreement. But Oura has refused to honor the Agreement.

6        108.    The Option Agreement allows Mr. Bal to purchase 29,167 shares. In May 2022,

7    Oura's stock was split, multiplying each share by 23. So Mr. Bal is now entitled to 670,841 common

8    shares.

9        109.    Oura is a privately traded company. Several years ago, it had a valuation of $2.55

10   billion. Ex. AB. In 2023, Oura generated approximately $225 million—up 53% year-over-year

11   from 2022. Ex. E. And in 2024, Oura was expected to generate nearly half a billion dollars—

12   doubling its annual revenue. Ex. F.

13       110.    On December 19, 2024, Oura announced that it had raised $200 million in a Series

14   D funding round. Ex. C. This investment raised Oura's valuation to $5.2 billion. *Id*. On information

15   and belief, this valuation supports concluding that the Option is currently worth more than

16   $16 million.

17   **J.    Oura Has Repeatedly Refused to Permit Optionees to Exercise Their Options**

18       111.    Mr. Bal is not the only investor, advisor, and service provider to Oura who has been

19   denied the contractual right to exercise options.

20       112.    Other high-profile individuals had similar option agreements with Oura that Oura

21   has breached by preventing those individuals from exercising the options.

22       113.    Dr. Peter Attia is a renowned physician who focuses on the applied science of

23   longevity. Dr. Attia had a similar option agreement with Oura in exchange for his services as a

24   medical provider and promoter of the ring. Dr. Attia had negotiated his agreement with Mr. Rai,

25   who represented Oura.

26       114.    In or about January 2022, Dr. Attia tried to exercise his options. But Oura was

27   unresponsive. So Dr. Attia retained counsel and sent a formal demand. Oura's general counsel

28

eventually responded that Oura would not honor the option agreement, offering unspecified lesser monetary compensation.

115.    Dr. Attia sued Oura in the Northern District of California. That case is pending before Judge Haywood Gilliam, Jr., although it was stayed for the past year due to Oura's appeal of the Court's denial of its motion to compel arbitration. The Ninth Circuit heard oral argument for the appeal on February 13, 2025. In a memorandum disposition issued on March 21, 2025, the Ninth Circuit rejected all Oura's arguments, holding that the district court had authority to decide whether the parties agreed to arbitrate the dispute *and* that the Shareholder Agreement does not govern the option agreement. *See* Ex. AC.

116.    On May 21, 2025, Dr. Attia amended his complaint, adding allegations that Oura defrauded him by representing that Oura's Board of Directors had approved the grant of stock options when, in fact, no approval had been issued.

117.    On June 4, 2025, Oura answered the amended complaint.

118.    Former football star Drew Brees also entered into an option agreement with Oura. Mr. Brees had negotiated with Mr. Rai, who represented Oura. On or about December 23, 2023, Mr. Brees tried to exercise his options by sending a check for the option amount. But Oura again refused to allow the exercise of an option agreement.

119.    So Mr. Brees filed suit against Oura, too. In late September 2024, Mr. Brees alleged that Oura breached his option contract in the Superior Court of California for the County of San Francisco. In the alternative, Mr. Brees alleged that Oura defrauded him by falsely representing Mr. Rai's authority to enter the contract and the Board of Directors' approval of the grant of stock options.

120.    Oura removed the action to the Northern District of California, where Mr. Brees moved to remand. On February 18, 2025, the court granted Mr. Brees's motion for remand, rejecting Oura's opposing arguments.

121.    Oura Health has filed an Answer to Mr. Brees's complaint. In Oura Health's Answer, it "admits that an 'Oura Health Advisor Equity Plan 2018' never existed." Ex. AD at 5. Mr. Bal's Option Agreement, just like Mr. Brees's option agreement and perhaps others' option

agreements, stated that the option had been awarded "under the Oura Health Adviser Equity Plan 2018." Ex. T at 1; *see also* Ex. AE (Mr. Brees's option agreement). In fact, provisions of Mr. Bal's Option Agreement specifically referenced provisions of the non-existent Plan, such as Mr. Bal's "entitle[ment] to exercise [his] vested Options as provided in Section 5(c) of the US Addendum." Ex. T at 1.

122.    The Option Agreement explicitly references and cites a non-existent Plan. This reliance on a non-existent document confirms that Oura had never intended to permit optionees to exercise their options. The Option Agreement was a ruse from the start.

123.    Oura has a pattern of entering into option contracts with investors, advisors, and service providers, offering stock options in exchange for advising, marketing, and promotional services. But once Oura has gotten its end of the bargain, it refuses to permit optionees to exercise their options.

124.    Oura thus has used the promise of stock options to obtain the services of successful individuals like Dr. Attia, Mr. Brees, and Mr. Bal. Those individuals have promoted Oura's ring and advised the company with the justifiable expectation that they would receive future stock options. But, on information and belief, Oura concealed the fact that it never planned to provide the full stock options, as evidenced by Oura's repeated and delayed notification to optionees that Oura would not permit the exercise of options, as well as the agreements' references and citations to a non-existent plan. Indeed, Oura informed optionees that the option agreements would not be honored only when optionees sought to exercise their options. At that point, having already reaped the benefits of the agreements, Oura apparently saw no reason to honor the agreements.

## **FIRST CAUSE OF ACTION**

### (Breach of Contract)

125.    Plaintiffs reallege and incorporate all preceding paragraphs here.

126.    Plaintiffs and Defendants entered a valid and enforceable contract.

127.    Plaintiffs promised to provide services and advice. Defendants promised that Plaintiffs would have the option to buy 29,167 shares after the 90-day sales target was met and the vesting period ended.

128.    Plaintiffs fully performed all services. All conditions precedent to Defendants' performance were met.

129.    But Defendants refused to perform. Defendants refused to permit Plaintiffs to exercise their stock options under the option contract, and Defendants thereby breached the option contract.

130.    Plaintiffs are entitled to specific performance of the option contract, and they are ready to pay the option price.

131.    Pursuant to Section 7.5 of Oura Health Oy's Amended and Restated Shareholders Agreement dated 13 November 2024, the Board of Directors is authorized by the Company's shareholders to grant option rights and issue stock to consultants, including through the use and re-issuance of Returned Incentive Securities. On information and belief, this provision, among other authorities, enables Oura to perform under the option contract.

132.    Alternatively, Plaintiffs have suffered damages in the amount of the difference between the exercise price and the value of the stock. In that case, Defendants' breaches have caused Plaintiffs to incur damages in an amount to be determined at trial and in excess of $16 million.

## SECOND CAUSE OF ACTION

(Breach of Covenant of Good Faith and Fair Dealing)

133.    Plaintiffs reallege and incorporate all preceding paragraphs here.

134.    A covenant of good faith and fair dealing is implied in every contract in California.

135.    Plaintiffs and Defendants entered a valid and enforceable contract. Plaintiffs promised to provide services and advice, and Defendants promised stock options.

136.    Plaintiffs performed their duties under the contract in accordance with the implied covenant of good faith and fair dealing. Plaintiffs performed all obligations under the option contract. All conditions precedent to Defendants' performance have been satisfied.

137.    But Defendants refused to perform.

138.    Defendants materially and substantially breached the implied covenant of good faith and fair dealing by withholding from Plaintiffs the option to purchase shares after Plaintiffs were

entitled to do so under the option contract. Defendants had no legitimate basis to withhold the option to purchase shares. By acting without legitimate basis and refusing to perform under the contract, after Defendants had already gotten the full benefit of the contract, Defendants breached the implied covenant of good faith and fair dealing.

139.    Defendants' breach caused Plaintiffs damages in an amount to be determined at trial and in excess of $16 million. These damages are the natural and probable consequence of Defendants' refusal to perform.

### THIRD CAUSE OF ACTION

(Unjust Enrichment)

140.    Plaintiffs reallege and incorporate all preceding paragraphs here.

141.    In the alternative to Plaintiffs' breach of contract claim, Plaintiffs are entitled to recover in *quantum meruit* if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between Plaintiffs and Defendants, Plaintiffs performed services that were outside of or beyond those contemplated by the existing contract, or the existing contract is void, invalid, or unenforceable.

142.    Defendants requested that Plaintiffs provide services to them.

143.    Plaintiffs in good faith provided valuable services to Defendants and for Defendants. Defendants have admitted that these services were instrumental to Defendants' success. Defendants knowingly and voluntarily accepted and benefited from Plaintiffs' services.

144.    Defendants were aware and knew that Plaintiffs provided services, including services at a heavy discount and advice work without other compensation, in reliance on the promises made in the option contract. Defendants knew that Plaintiffs were not providing these services gratuitously. Instead, Defendants knew that Plaintiffs expected to be compensated by stock options.

145.    But Defendants did not provide the stock options or otherwise pay Plaintiffs the full value of Plaintiffs' services. Defendants have refused to pay Plaintiffs the full value of the services rendered.

146.    So Defendants have been unjustly enriched by Plaintiffs' services. Plaintiffs are entitled to recover in an amount to be determined at trial and in excess of $16 million.

## **FOURTH CAUSE OF ACTION**

### (Promissory Estoppel)

147.    Plaintiffs reallege and incorporate all preceding paragraphs here.

148.    Pleading in the alternative, if there was no valid and enforceable contract, the contract does not cover the subject matter of the dispute, Plaintiffs performed services outside those contemplated by the contract, or the contract is for some reason found to be void, invalid, or unenforceable, then the agreements should be enforced under the doctrine of promissory estoppel.

149.    Through Mr. Rai, Defendants clearly and unambiguously promised Plaintiffs that when the 90-day sales target was met and the vesting period had elapsed, then Plaintiffs would have the opportunity to buy 29,167 shares at a set price. Defendants are in a position to fully perform and issue the stock at the agreed price, but Defendants have refused to honor their promise.

150.    Plaintiffs have acted in accordance with all directions from Defendants. In reliance on Defendants' promise, Plaintiffs provided services at a heavy discount and performed advice work without other compensation. Plaintiffs have thereby reasonably and justifiably relied on the promise to their detriment.

151.    It was foreseeable that Plaintiffs would rely on Defendants' promise. Defendants knew that Plaintiffs were providing services at a discount and advice work without other compensation, relying on the promise of stock options.

152.    Injustice can be avoided only by enforcing Defendants' promise of stock options. Plaintiffs have worked to promote Oura's product and Oura would not be where it is today without Plaintiffs' efforts—as Oura's then-CEO admitted. So injustice can be avoided only by enforcing Defendants' promise to give Plaintiffs the promised equity in Oura.

153.    Pursuant to Section 7.5 of Oura Health Oy's Amended and Restated Shareholders Agreement dated 13 November 2024, the Board of Directors is authorized by the Company's shareholders to grant option rights and issue stock to consultants, including through the use and re-

issuance of Returned Incentive Securities. On information and belief, this provision, among other authorities, enables Oura to perform under the option contract.

154.    The injustice of Defendants' refusal to honor the option contract is magnified by their practice of promising stock options to induce successful individuals to promote Defendants' products and then declining to issue the stock. Defendants should be held to their word.

155.    Defendants' refusal to honor their promise has caused Plaintiffs' damages in an amount to be determined at trial and in excess of $16 million.

**FIFTH CAUSE OF ACTION**

(Promissory Fraud)

156.    Plaintiffs reallege and incorporate all preceding paragraphs here.

157.    Through Mr. Rai, Defendants told Plaintiffs that they would receive stock options when Defendants hit a 90-day sales target. This false promise was made to induce Plaintiffs to provide some services to Defendants at a discount and other services without compensation.

158.    Plaintiffs are informed and believe and, on that basis, allege that Defendants had no intention of honoring the false promise because (1) Defendants in part based the Agreement on a fictitious "Plan," (2) Defendants tried to rescind the promise as soon as they had received a substantial benefit from Plaintiffs' work, and (3) Defendants have refused to honor similar promises to other similarly situated individuals.

159.    Plaintiffs are informed and believe and, on that basis, allege that Defendants deliberately made the false promise about the stock option to induce Plaintiffs to perform some services at a discount and other services without compensation.

160.    Plaintiffs relied to their detriment on Defendants' false promise by entering into the marketing services agreement at a discount and providing advising services without compensation. If Plaintiffs had known that the promise of a stock option was false, then Plaintiffs would neither have rendered their services at a discount nor without compensation.

161.    Plaintiffs' reliance on Defendants' false promise was justified because Plaintiffs had no reason to doubt the truthfulness of Defendants' promise. Plaintiffs were investors in Defendants, and stock option agreements are common for fast-growing private companies.

162.   Defendants' false promise was the direct and proximate cause of Plaintiffs' damages, which Plaintiffs would not have sustained but for Defendants' fraud.

163.   Plaintiffs sustained damages and are entitled to recover in an amount to be determined at trial and in excess of $16 million.

164.   Plaintiffs are entitled to punitive damages because there is clear and convincing evidence that (1) Defendants have or had a practice of offering option contracts to individuals with no intention of honoring them, which allows or allowed Defendants to secure the promotion and services of successful individuals; (2) Defendants' fraudulent conduct would foreseeably cause substantial injury to optionees; (3) Defendants have an incentive to engage in this fraudulent conduct because every option withheld increases Oura's value; and (4) Defendants' fraudulent conduct substantially damaged Plaintiffs.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment against Defendants as follows:

1.   That the Court enter judgment against Defendants that Defendants have:

   a.   Breached their contract with Plaintiffs in violation of California law;

   b.   Breached the implied covenant of good faith and fair dealing;

   c.   Been unjustly enriched at the expense of Plaintiffs in violation of California law;

   d.   Unjustifiably and foreseeably induced Plaintiffs to perform underpaid and unpaid work based on the promise of the option to purchase stock; and

   e.   Falsely represented to Plaintiffs that Defendants would provide the option to purchase stock when they had no intention of doing so in violation of California law.

2.   That the Court further award:

   a.   Damages in such amounts to be proven at trial;

   b.   Punitive damages in such amounts to be proven at trial;

   c.   Restitution for the value of the services Plaintiffs provided to Defendants;

       d.      Specific performance of the option contract and such injunctive relief as may be necessary to ensure performance, in the alternative to actual damages;

       e.      Attorneys' fees and expenses;

       f.      Pre- and post-judgment interest as allowed by law;

       g.      All costs, including under Federal Rule of Civil Procedure 54(d)(1) and Cal. Civ. Proc. Code § 1032(b); and

       h.      All such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: July 1, 2025

JENNA FARLEIGH
JULIAN SCHNEIDER
SUSMAN GODFREY L.L.P.

By:   */s/ Jenna Farleigh*
        Jenna Farleigh

*Attorneys for Plaintiffs*
*Mr. Bal and CTR Capital Inc.*

1

## **DEMAND FOR JURY TRIAL**

2

    Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

3

Dated: July 1, 2025

4

JENNA FARLEIGH
JULIAN SCHNEIDER
SUSMAN GODFREY L.L.P.

5

6

By:    */s/ Jenna Farleigh*
        Jenna Farleigh

7

*Attorneys for Plaintiffs*
*Mr. Bal and CTR Capital Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28